# DECISIONS

OF THE

# SUPREME COURT OF FLORIDA,

## AT TERMS HELD IN 1867-'8.

---

DAVID S. WALKER, APPELLANT, VS. JAMES H. GATLIN, APPELLEE.

The warranty contained in a bill of sale given for a negro, that he was to be "a slave for life," is not broken by the subsequent act of the Government, which abolished in the Southern States the institution of negro slavery.

Appeal from Leon Circuit Court.

This case was decided at Tallahassee.

A statement of the case is contained in the opinion of the Court.

*R. B. Hilton* and *A. L. Woodward* for Appellant.

*J. D. Westcott* for Appellee:

A covenant that a slave is a slave for life, is repealed by the act of a convention of the people of a State abolishing slavery, and the destruction or deprivation of property by such action is no breach of the covenant.—5th Cowen, 538, and cases there cited.

The covenant does not extend to the acts of the government—it is restricted to parties, not strangers.

A covenant for quiet enjoyment does not extend to a

2

forcible eviction by a stranger claiming no right through covenantor.

The covenant is good also, for at the time he was a slave for life.

A covenant for quiet possession is *subject* to the right of eminent domain.—7 Mass., 325.

The covenant has reference only to the *status* of the property at the date of the contract, and if there was no defect in the title then, no supervening event can affect the rights of the parties.

*M. D. Papy* on the same side.

DuPONT, C. J., delivered the opinion of the Court.

The appellant, together with one Joseph H. Alston, was the joint maker of a promissory note, dated February, 1861, and payable on or before the first day of October, 1862. This note was given to secure a part of the price agreed to be paid by the said Alston to the appellee for a negro. The appellee executed to Alston a bill of sale for the property, containing a clause of warranty, that the negro was "a slave for life." The note not having been paid at maturity, suit was instituted and a judgment obtained thereon at the March Term, 1864, of the Leon Circuit Court.

Subsequently, to-wit: on the 28th day of March, A. D. 1866, the appellant filed his bill for an injunction to restrain the enforcement of the judgment at law, alledging as ground of equity "that said Gatlin warranted said slave to be a slave for life; that said slave is still living; that since the making of said note, and rendition of said judgment, the Government of the United States has destroyed slavery in this State, and the people of this State, in convention assembled, have declared in their Constitution that all the inhabitants of this State, without distinction of color, are free, and that slavery shall not in future exist in this State." He

further alledges that " he could not plead the above defence in bar of the judgment, because slavery had not been abolished in this State, as above stated, at the date of the judgment, and therefore he has been guilty of no laches. The injunction was granted in accordance with the prayer of the bill, but on the coming in of the answer, and upon motion, the same was dissolved. It is from the order of the Chancellor dissolving the injunction that this appeal is taken.

It will be perceived that the point presented for the adjudication of the Court has arisen out of the recent abolition of the institution of negro slavery, as it heretofore existed in this State. It might be a question more curious than profitable, under existing circumstances, whether the act of emancipation owes its operative effect to the proclamation of the President of the United States, the action of the State Convention, or the amendment to the Constitution of the United States. It is sufficient for this argument, that the status of the negro, the sale and purchase of whom constitutes the subject matter of the controversy, has been altered from that of slavery to freedom since the date of the contract. That change is not controverted; and, indeed, as a "fact accomplished," (whatever may be thought of its legality,) admits of no controversy.

The terms of the warranty under consideration was, during the existence of negro slavery, of very frequent occurrence in all bills of sale given for slaves; and we are now called on to decide whether such a covenant, made at a period when the legal existence of that institution was recognized, both by the Federal and State Constitutions, is to be deemed to have been broken by the act abolishing that institution. In the consideration of this question, we are measureably without precedent, and certainly without anything that is entitled to the character of authority. The question is of such recent origin, that the very few adjudications which have been made, cannot as yet be recognized

as of binding force under the maxim of *stare decisis.* They are suggestive, and to that extent ought to be looked to with all proper respect, and may be consulted with profit. Before, however, making reference to the decided cases, which have fallen under our observation, we prefer to fortify the conclusion at which we have arrived, by the application of well recognized principles of interpretation, to the contract entered into by the parties, and by an argument drawn from a case of close analogy.

This covenant or warranty partakes of all the essential elements of an ordinary contract between the vendor and vendee of the slave, and as a contract, is subject to the same rules of interpretation that would be applied in other cases. Amongst the most prominent of these rules is that one which looks to the intention and understanding of the parties. To arrive with proximate certainty at that intention, it is expedient to consider the nature of the contract, the position of the parties, and the political circumstances that surrounded them.

Here was a contract or agreement for the sale and pur-chase of a negro slave, evidenced by the execution, delivery and acceptance of a conveyance in writing, containing a stipulation or covenant, that the negro so agreed to be sold, was to remain a "slave for life." The parties, vendor and vendee, occupied a position of perfect equality, and were dealing with each other at arms length. The one agreed to transfer to the other his title in the property, and by a clause of special warranty, to guarantee its *political status.* The other, in consideration of such transfer and guaranty, agreed to pay a stipulated price, on or before a stipulated day, and evidenced the same by the execution and delivery of the promissory note, upon which the judgment was obtained that is now sought to be enjoined. At the date of this agreement, as well as at the date when the judgment was rendered, it is not pretended but that the entire transaction

was perfectly legal under the then existing constitution and laws of the State. Having thus grouped into one view the nature of the contract, the position of the parties, and the political circumstances that surrounded them, we are now the better prepared to answer the question touching the intention and understanding of the parties.

It will be noted that the date of this contract is only about one month subsequent to the date of the "Ordinance of Secession," which placed this State by the side of her sisters, South Carolina and Mississippi, in their assertion of the right to exist as "independent sovereignties." Can it for a moment be imagined, that at that interesting period, when all hearts were aglow with buoyant hopes of national independence, it ever entered into the mind of either party that the warranty given in the bill of sale was *intended* to provide against the possible contingency which has since happened—the defeat and overthrow of the Confederate Government, and the consequent abolition of the institution of negro slavery? Such an assumption is repelled by the well-known character of the parties to this contract, and we are irresistibly forced to the conclusion that the insertion of the warranty contained in the bill of sale was understood and intended to have reference exclusively to the status of the property as it existed at the date of the contract, and not to be affected by any supervening event that might transpire and operate to alter that status. As well might it be contended that if this negro had escaped from the possession and control of the vendee, and taken up his abode in one of the so-called free States, where, in consequence of the condition of public sentiment, it was impracticable to reclaim him, the warranty would have been thereby broken. In that case as in this, the negro would have been in life, and yet the right of property as nugatory and worthless as under the operation of the act of emancipation. Or had he been captured during the progress of hostilities between the

Confederate and United States, and transported beyond the territorial limits and jurisdiction of the former, would it be seriously insisted that such capture and transportation to a place where he would be protected in the enjoyment of his personal freedom would amount to a breach of the warranty? It may, with some degree of plausibility be replied, that his escape or capture would not affect the *legal* status of the negro, but only operate to deprive the vendee of the ability to control or use him as property. That may be so, and yet *practically* he would be as much a free man, and that, during life, as he now is under the operation of the act of emancipation. If it be admitted, as it undoubtedly will be, that in these supposititious cases the warranty would be held not to have been broken, we can perceive no good reason why a different conclusion should be arrived at in the case before us. The fact of *intention* is as patent in the one as in the other. In either case, the *loss of property* is effected, not by the act of the vendor, but by an act entirely beyond his control, and for the consequences of which he ought not to be held responsible.

In announcing the foregoing conclusion, we are not to be understood as holding that it was, or was not, in the power of the parties to give and accept a warranty against the very contingency which has unfortunately happened. Whether an individual can legally enter into an agreement to insure against the future act of the government, to which he owes allegiance, is a question which, upon general principles of national law, may admit of some doubt. But, be that as it may, if such had been the intention and understanding of the parties to this contract, they would doubtless have been more explicit in making known that intention than by adopting a stereotyped formula, which had been in use under an entirely different condition of things for more than two hundred years. Such an intention, clearly manifested by the terms used, would have imparted to the instrument rather

the character of a "policy of insurance" than that of an ordinary *warranty* of title and of continuous possession.

Thus subjecting the question to the test of *intention*, the Court is clearly of opinion that there has been no breach of the warranty contained in the bill of sale, and that consequently, the injunction which had been granted to stay the execution at law, was properly dissolved.

But if any further argument be required to sustain and fortify our conclusion, we invoke with confidence the doctrine which prevails in the case of real estate, where interpretation is given to the analogous covenant for "quiet enjoyment." The doctrine in that case is well settled that such covenant will not be held to be broken by any action of the supreme authority of the State, and it is based upon the established right of "eminent domain," as defined in the books. This right finds its sanction in the idea that the ultimate title to all property resides in the government, and that its enjoyment by the citizen is held subservient to that limitation and condition.

Chancellor Walworth, commenting upon this subject, says: "Notwithstanding the grant to individuals, the eminent domain, the highest and most exact idea of property, remains in the government or in the aggregate body of the people in their sovereign capacity; and they have a right to resume the possession of the property in the manner directed by the laws and constitution of the State, whenever the public interest requires it. This right of resumption may be exercised, not only where the safety, but also where the interest, or even the expediency of the State is concerned."—3 Paige R., 73; vide also 6 Cowan R., 538.

Mr. Justice Daniel, in delivering the opinion in the case of "The West River Bridge Company vs. Dix, et. al.," decided in the Supreme Court of the United States, says: "Under every established government, the tenure of property is derived mediately or immediately from the sovereign power

of the political body organized in such mode or exerted in such way as the community or State may have thought proper to ordain. It can rest on no other foundation, can have no other guarantee. It is owing to these characteristics only, in the original nature of tenure, that appeals can be made to the laws, either for the protection or assertion of the rights of property. Upon any other hypothesis the law of property would be simply the law of force. Now it is undeniable that the investment of property in the citizen by government, whether made for a pecuniary consideration or founded on conditions of civil or political duty, is a contract between the State or the government acting as its agent, and the grantee; and both the parties thereto are bound in good faith to fulfil it. But in all contracts, whether made between the State and individuals, or between individuals only, there enter conditions which arise not out of the literal terms of the contract itself; they are superinduced by the pre-existing and higher authority of the laws of nature, of nations, and of the community to which the parties belong; they are always presumed, and must be presumed, to be known and recognized by all—are binding upon all, and need never, therefore, be carried into express stipulation, for this could add nothing to their force. Every contract is made subservient to them, and must yield to their control, as conditions inherent and paramount, wherever a necessity for their execution shall occur. Such a condition is the right of eminent domain."—6 How. S. C. R., 532.

Applying the doctrine here so luminously set forth to the case before us, it must be manifest that the vendor and vendee—the one giving and the other accepting the warranty, that the negro was " to be a slave for life," contracted with each other in the full understanding that their contract was subservient to any change in the political status of the negro contracted for, which the supreme authority of the State might at any time see proper to decree. The spirit of

Walker vs. Gatlin—Opinion of Court.

the contract had reference exclusively to the then status of the title, and there was no *insurance* or guaranty against the exercise of this right of sovereignty residing in the State.

In discussing the right of "eminent domain," we know that it is usual to refer its exercise to reality rather than to personalty; but this is so only because the necessity for the application is more frequent in the one case than in the other. If, in the exercise of this right, the supreme authority may control the status of real property, there is no conceivable reason way its exercise may not reach personalty, subject, of course, to the limitations and conditions contained in the fundamental law of the State. This right of sovereignty has been applied to and exercised over the negro involved in this controversy, so as to alter his political status, as it existed at the date of the contract, from that of slavery to freedom, and we do not think that the vendor should be held responsible for the act; it is one over which he could exercise no control.

It is gratifying to us to know that the conclusion arrived at in this case is sustained by two recent decisions of the Supreme Court of Georgia, where the same question was solemnly adjudicated. We refer to the case of "Hand vs. Armstrong," and "Bass vs. Ware," decided at the June Term, 1866.

This being the first case in which the point presented by the record has arisen in this Court, we have given to its investigation more than usual attention, and are well satisfied that the conclusion at which we have arrived is in perfect accordance with both the law and equity of the case.

Let the order of the Chancellor dissolving the injunction be affirmed with costs.